William SANJOUR, et al., Appellants,

v.

ENVIRONMENTAL PROTECTION AGENCY, et al.

No. 92–5123.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 21, 1992.

Decided Jan. 29, 1993.

435

Stephen M. Kohn, Washington, DC, for appellants.

Alfred Mollin, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen.; Jay B. Stephens, U.S. Atty.; and John C. Hoyle, Atty., Dept. of Justice, Washington, DC, were on the brief, for appellees. Michael Jay Singer, Washington, DC, entered an appearance for appellees.

David C. Niblack, Washington, DC, was on the brief for amicus curiae Environmental and Civic Organizations in support of appellants.

James H. Evans, Atty. Gen.; R. Craig Kneisel, Asst. Atty. Gen.; Montgomery, AL, and Mort P. Ames, Deputy Atty. Gen., Selma, AL, were on the brief for amicus curiae State of Alabama in support of appellants.

Before WALD, SILBERMAN, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Dissenting opinion filed by Circuit Judge WALD.

SENTELLE, Circuit Judge:

Appellants challenge the constitutionality of an ethics regulation allowing employees of the Environmental Protection Agency ("EPA") to accept reimbursement for travel expenses they incur in giving "official" speeches, but not "unofficial" speeches, as violative of their First Amendment rights. The District Court granted summary judgment against them on their facial challenge, but allowed the litigation to proceed as to their as-applied challenge under the First Amendment. 786 F.Supp. 1033. We, too, reject their facial challenge and therefore affirm. We do not pass on their selective enforcement claim, which remains pending before the District Court.

## I.

Appellants William Sanjour and Hugh Kaufman have been employed by the EPA in Washington, D.C. since the 1970s. During that time, both have traveled across the country giving unofficial speeches criticizing the policies of the EPA. In the past, they routinely accepted reimbursement from the organization sponsoring their speeches for their travel and related expenses. Under prior law, they were allowed to do so, as long as the sponsoring organization was not a "prohibited source" (*i.e.*, did no business with, and was not regulated by, the EPA) and as long as they gave the speeches on their own time without implying that they presented anything other than their personal opinions. *See* Office of Gov't Ethics Memorandum No. 84 X 5 (May 1, 1984).

On January 17, 1991, however, the Office of Government Ethics ("OGE") adopted a rule that interprets existing ethics law to preclude any federal employee from "receiving compensation, including travel expenses, for speaking or writing on subject matter that focuses specifically on his official duties or on the responsibilities, policies and programs of his employing agency." 56 Fed.Reg. 1,721, 1,724 (1991) (to be

codified at 5 C.F.R. § 2636.202(b) (1992)).[1] The EPA distributed this regulation to its employees with an Ethics Advisory expressing its understanding that the rule allows expense reimbursement for "official" but not "unofficial" speech. *See* EPA ETHICS ADVISORY 91–1, at 3 & n. 5 (Apr. 2, 1991) (opining that "[e]mployees may not accept *non-official* travel expenses ... [but] [w]ith the required prior approvals, employees may continue to accept travel reimbursement for official travel").[2] Though the Ethics Advisory does not define the terms "official" and "unofficial," the EPA has elsewhere provided that speech or writing is official "if it results from a request to EPA to furnish a speaker, author or editor ... [or] is tendered because of the employee's EPA position rather than the employee's individual knowledge or accomplishments." 40 C.F.R. § 3.503 (1991).

Because the OGE/EPA regulation barred them from accepting travel-expense reimbursement for unofficial speech, Sanjour and Kaufman declined speaking invitations by organizations located outside the Washington, D.C. metropolitan area. Among the organizations both turned down was appellant North Carolina Waste Awareness and Reduction Network ("NC WARN"). NC WARN, a North Carolina environmental coalition, had invited them to speak about EPA policies in an unofficial capacity at a public hearing concerning a plan to build a commercial hazardous waste incinerator in Northampton County, N.C. When Sanjour and Kaufman declined its

invitation, NC WARN cancelled the public hearing.

Appellants then filed this lawsuit against appellees, the EPA, the OGE, the EPA Administrator and the OGE Director, and others not before this Court, challenging the legality of the OGE/EPA regulation on both statutory and First Amendment grounds. The District Court granted appellees' motion for summary judgment on the statutory claims and on the facial challenge under the First Amendment. However, the District Court held that appellants' as-applied challenge involved disputed issues of material fact and denied summary judgment. *Sanjour v. EPA,* 786 F.Supp. 1033 (D.D.C.1992). The as-applied challenge therefore remains pending before the District Court.

Before this Court, appellants, with support from the State of Alabama and a host of environmental organizations from various localities as *amicus curiae,* renew their contention that the OGE/EPA regulation is overbroad and underinclusive and therefore, on its face, violates the First Amendment. We emphasize that the facial challenge is all that is before us today; appellants elected not to appeal the District Court's dismissal of their statutory claims, and their selective enforcement claim remains before the District Court. Our task in this case, then, is a narrow one—we must decide whether the OGE/EPA regulation, on its face, violates the First Amendment on the asserted grounds.[3]

1. More fully, the new OGE rule provides, in pertinent part, that:

    (b) An employee is prohibited by the standards of conduct from receiving compensation, including travel expenses, for speaking or writing on subject matter that focuses specifically on his official duties or on the responsibilities, policies and programs of his employing agency.

    5 C.F.R. § 2636.202(b). None of the rule's terms are defined. However, to clarify any ambiguity, employees may request advisory opinions from their employing agencies' ethics officials. 5 C.F.R. § 2636.103. Good-faith compliance with such advisory opinions immunizes the employee from civil or disciplinary action by the OGE. 5 C.F.R. § 2636.103(c).

2. Hereinafter, we refer to the OGE regulation and EPA Ethics Advisory 91–1 collectively as the "OGE/EPA regulation."

3. Our dissenting colleague thus addresses an issue not properly before us in arguing that "there are no precise standards to cabin the EPA's discretion." Dissent at 459 n. 12. The closest appellants came to raising that claim is a point heading in their initial brief asserting that the OGE/EPA regulation is "unconstitutionally vague," Appellants' Br. at i, a claim they repeated verbatim in the conclusion to that section. *Id.* at 36. Their only "explication" in the argument is that "the OGE rules gives [sic] an agency the unfettered discretion to declare any proposed speech 'official.'" *Id.* at 35. The vagueness/unfettered-discretion claim is not

## II.

The parties disagree on the level of scrutiny applicable to this case. Appellants claim that we must apply strict scrutiny, under which the government "must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Simon & Schuster v. Members of the New York State Crime Victims Bd.,* —— U.S. ——, ——, 112 S.Ct. 501, 509, 116 L.Ed.2d 476 (1991) (quoting *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 231, 107 S.Ct. 1722, 1729, 95 L.Ed.2d 209 (1987)). By contrast, appellees argue that we must, in the Supreme Court's words, balance "the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). We briefly describe the precedents underlying each position before addressing the merits of the parties' claims.

### A.

In *Simon & Schuster,* the Court unanimously struck down New York's "Son of Sam" law, which required that income from an accused or convicted criminal's description of his crime be turned over to a fund for compensation of the criminal's victims and creditors. In doing so, the Court noted that the law restricted the speech both of criminals seeking to write about their crimes and publishers, such as Simon & Schuster, that wished to publish such works. —— U.S. at ——, 112 S.Ct. at 508.

otherwise mentioned, and appellants cited no authority in support of that claim. Unsurprisingly, therefore, neither the District Court's thorough opinion nor appellees' brief addresses the question.

Under these circumstances, we decline to address appellants' vagueness/unfettered-discretion argument. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) (per curiam). Nevertheless, we note that the OGE/EPA regulation contains provisions for remedy-

Holding that from either perspective, the law "establishes a financial disincentive to create works with a particular content," the Court applied strict scrutiny. *Id.* at ——, 112 S.Ct. at 509.

Almost twenty-five years earlier, in *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Court used a deferential balancing test in a case brought by a discharged public school teacher. Ruling unanimously that the teacher could not be fired for having written a letter to the local newspaper criticizing the school board, the Court balanced "the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734–35. The rationale for not applying strict scrutiny was that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.*

### B.

■ Appellants offer three arguments to support their claim that strict scrutiny, rather than the *Pickering* balancing test, applies here. They assert that *Simon & Schuster* requires courts to apply strict scrutiny to *all* financial burdens on speech, regardless of whether the speaker is a public employee. In support of this contention, appellants cite a passage in *Simon & Schuster* stating that "[t]he Government's power to impose content-based financial disincentives on speech surely does not

ing ambiguity in its applicability (*see* note 1, *supra*), *see United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, AFL–CIO,* 413 U.S. 548, 580, 93 S.Ct. 2880, 2897–98, 37 L.Ed.2d 796 (1973) (deeming it "important," in rejecting a similar challenge, "that the Commission has established a procedure by which an employee in doubt about the validity of a proposed course of conduct may seek and obtain advice from the Commission and thereby remove any doubt there may be as to the meaning of the law"), as well as definitions of the terms "official" and "unofficial." *See* 40 C.F.R. § 3.503 (1991).

vary with the identity of the speaker." —— U.S. at ——, 112 S.Ct. at 509. Appellants claim this language mandates that we cannot apply a lower standard in the public employment context.

We reject this selective reading of *Simon & Schuster*. It is plain to us that the Court, by the quoted phrase, merely intended to make clear that it is no defense to a First Amendment claim that the claimant is not a member of the media. Putting the quoted statement in context shows this to be so:

> Finally, the Board claims that even if the First Amendment prohibits content-based financial regulation specifically of the *media*, the Son of Sam law is different, because it imposes a general burden on any "entity" contracting with a convicted person to transmit that person's speech. This argument falters on both semantic and constitutional grounds. Any "entity" that enters into such a contract becomes by definition a medium of communication, if it wasn't one already. In any event, the characterization of an entity as a member of the "media" is irrelevant for these purposes. The Government's power to impose content-based financial disincentives on speech surely does not vary with the identity of the speaker.

*Id.* at ——, 112 S.Ct. at 509 (citation omitted). Therefore, *Simon & Schuster* does not require the application of strict scrutiny to all financial disincentives on speech.

Appellants' next argument is that *Pickering* does not govern because the OGE/EPA regulation does not simply restrict the speech of federal employees. The regulation, so the argument goes, also restricts the speech of nonemployees, such as NC WARN. In this respect, appellants analogize NC WARN to *Simon & Schuster* in that, as the publishers of the speech at issue, both were the targets of restrictions on speech. To that extent, appellants claim, strict scrutiny must be applied.

We likewise find „this argument unpersuasive. Though it may be true that the OGE/EPA regulation affects the speech of third-parties outside of the Government's employ, such as NC WARN and *amici*,

that was also true in *Pickering*. By firing the teacher for criticizing it, the school board in *Pickering* "chilled" teachers' speech critical of the board. Because the teacher's speech was directed (via his letter to the editor) to the local newspaper, the restriction on his speech also restricted the newspaper's speech, in that the newspaper intended to publish the teacher's letter and thereby "speak" against the school board. Despite this spillover restriction on nonemployee speech, *Pickering* applied a deferential balancing test. Thus, the spillover effect on NC WARN's speech, assuming such a restriction exists, does not defeat *Pickering*'s applicability here.

Appellants' final contention is that *Pickering* does not apply to content-based and viewpoint-based restrictions on speech. We regard this argument as similarly foreclosed by reference to *Pickering* itself. The Court there expressly noted that "[t]he Board [had] dismissed Pickering for writing and publishing the letter," which "constituted, basically, an attack on the School Board's handling" of certain issues. 391 U.S. at 566, 88 S.Ct. at 1733. A more recent case applying the *Pickering* standard, *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), supports this analysis. There, the Court applied *Pickering* even though the employee's termination was "based on the *content* of her speech," with which her supervisor strongly disagreed. *Id.* at 390, 107 S.Ct. at 2900. *Pickering* accordingly cannot be distinguished on the ground appellants urge.

We therefore adhere to our prior ruling that "*Pickering* and its progeny continue to be the meter by which the First Amendment rights of public employees are to be measured," *Tygrett v. Barry*, 627 F.2d 1279, 1282 (D.C.Cir.1980), and hold that the *Pickering* balancing test applies to appellants' First Amendment challenge.

### III.

■ Because the familiar *Pickering* test is most often applied in employee discharge or discipline cases rather than in challenges to rules such as the OGE/EPA regulation, we set out the applicable standards at some

length below. Before doing so, however, we observe that we must decide the *Pickering* balance *de novo*, without deferring to the balance the District Court struck. *Hubbard v. EPA*, 949 F.2d 453, 458 n. 2 (D.C.Cir.), *vacated in part on other grounds*, 982 F.2d 531 (D.C.Cir.1992) (en banc).[4] This is so because this is a question of law. *Hall v. Ford*, 856 F.2d 255, 258 (D.C.Cir.1988).

### A.

Because "the First Amendment's primary aim is the full protection of speech upon issues of public concern," *Connick v. Myers*, 461 U.S. 138, 154, 103 S.Ct. 1684, 1694, 75 L.Ed.2d 708 (1983), the Court must determine, as a threshold matter, whether the public employee's speech pertained to "matters of public concern." *Id.* at 146, 103 S.Ct. at 1689. Speech pertains to "matters of public concern" if it relates to "any matter of political, social, or other concern to the community." *Id.* If, judging from the "content, form, and context" in which the statement or speech was made, the speech does not so pertain, then "absent the most unusual circumstances," the Court may not proceed any further, for "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision." *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690; *see also Hall*, 856 F.2d at 258.

However, if the speech does pertain to matters of public concern, the Court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35 (1968); *see also Hall*, 856 F.2d at 258. Harm to the governmental or state interest cannot be presumed, *American Postal Workers Union, AFL–CIO v. United States Postal Serv.*, 830 F.2d 294, 304 n. 13 (D.C.Cir.1987); *Tygrett v. Barry*, 627 F.2d 1279, 1282

(D.C.Cir.1980), or based on "unadorned speculation." *Hall*, 856 F.2d at 261. Nevertheless, we and the Supreme Court have recognized that a government "employer is not required to tolerate action which [it] reasonably believed" would cause harm. *Hubbard*, 949 F.2d at 460 (quoting *Connick*, 461 U.S. at 154, 103 S.Ct. at 1694). "For regulation of employees it is not necessary that the act regulated be anything more than an act reasonably deemed ... to interfere with the efficiency of the public service." *United Public Workers v. Mitchell*, 330 U.S. 75, 101, 67 S.Ct. 556, 570, 91 L.Ed. 754 (1947). And in some situations, "the circumstances and content of the speech [may] make unequivocal its harmful effects." *American Postal Workers Union, AFL–CIO*, 830 F.2d at 304 n. 12.

### B.

Two of the above issues are not in question here. Appellees have conceded that appellants' speech about EPA policies pertained to matters of public concern. In addition, appellants do not challenge the legitimacy of the proffered governmental end—avoiding the appearance of impropriety. In our view, these were wise concessions. The parties do, however, sharply dispute the severity of the burden the regulation imposes on EPA employees' speech and, therefore, the balance of the competing interests of the Government and its employees in the EPA.

### 1.

#### *The Employees' Interest*

■ Appellants characterize the burden the OGE/EPA regulation imposes on their speech as "severe" because it is nothing short of an "economic bar to speech." Appellees dispute the severity of the regulation's burden on free speech, arguing that the strength of appellants' First Amendment interest is greatly reduced because the regulation allows them to speak whenever and on whatever topics they choose

---

**4.** We, like the *Hubbard* panel, need not decide whether deference is owed the underlying factu-

al determinations of the District Court.

and merely prohibits EPA employees from accepting expense reimbursement. We find merit in this argument. As appellees correctly note, the OGE/EPA regulation does not prohibit speech in any way. EPA employees may speak now, as before, on whatever topics they choose. The rule only forbids EPA employees to obtain reimbursement from non-federal sources for speaking or writing in an unofficial capacity about their "official duties or on the responsibilities, policies and programs" of the agency. 5 C.F.R. § 2636.202(b). Although restricting reimbursement for unofficial speech does implicate the First Amendment, we cannot agree with appellants that the OGE/EPA regulation imposes a severe burden on the First Amendment rights of EPA employees. Rather, we view the burden in this regard as moderate, though not insignificant.[5]

### 2.

### The Government's Interest

As for the Government's side of the balance, appellants argue that the governmental interest underlying the OGE/EPA regulation is an illegitimate one—the suppression of unofficial speech. That is, they claim that the regulation is both content-based and viewpoint-based. As they view matters, and as the District Court agreed, 786 F.Supp. at 1037–38, EPA critics will be disproportionately disadvantaged by the OGE/EPA regulation because supporters, unlike critics, of EPA policy will probably be allowed to speak in an official capacity, thereby allowing supporters but not detrac-

tors of the EPA to receive travel-expense reimbursement. For this reason alone, appellants argue, the OGE/EPA regulation is "presumptively invalid" under the First Amendment. R.A.V. v. St. Paul, — U.S. —, —, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992) (citing cases).

Appellants' empirical assertion may or may not be correct,[6] but, importantly, it is an empirical statement. Appellants forget that we have before us only a facial challenge to the OGE/EPA regulation. We must approach such challenges "with caution and restraint, as invalidation may result in unnecessary interference with a state [or federal] regulatory program." Erznoznik v. City of Jacksonville, 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975).

Given the nature of a facial challenge, appellants bear the heavy burden of showing that the OGE/EPA regulation "could never be applied in a valid manner" or is "so broad that it 'may inhibit the constitutionally protected speech of third parties.'" New York State Club Ass'n v. New York City, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988) (quoting Members of the City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 798, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 722 (1984)); see also Federal Election Comm'n v. International Funding Inst., Inc., 969 F.2d 1110, 1118 (D.C.Cir.1992) (en banc) (same); American Library Ass'n v. Barr, 956 F.2d 1178, 1190 (D.C.Cir.1992) (same). Consequently, "[a] facial challenge to a legislative Act is, of course, the most difficult

---

5. The dissent criticizes as formalistic our conclusion that the burden the OGE/EPA regulation imposes only a moderate burden on employee speech. See Dissent at 452–53. We respectfully disagree. Quite clearly, a restriction on accepting reimbursement for speaking is significantly less burdensome than an outright ban on speech. A ban prohibits speech and leaves the employee, to use the dissent's term, "gagged." A restriction on reimbursement, such as the OGE/EPA regulation, leaves the employee free to speak whenever and on whatever topics he chooses, even though it allows reimbursement for other types of speech. Far from being formalistic, the distinction we have drawn is true to the Supreme Court's admonition that

"'[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity.'" Rust v. Sullivan, — U.S. —, —, 111 S.Ct. 1759, 1772, 114 L.Ed.2d 233 (1991) (quoting Maher v. Roe, 432 U.S. 464, 475, 97 S.Ct. 2376, 2383, 53 L.Ed.2d 484 (1977)).

6. We, of course, express no opinion whatsoever on the merit of appellants' as-applied challenge. We note, however, that the concerns the dissent raises in the facial challenge before us—for example, that the OGE/EPA regulation cannot constitutionally apply to "a federal employee addressing a church supper in return for train fare and a few bites of casserole," Dissent at

challenge to mount successfully." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987).

The Supreme Court has explained these exceptions to the rule that "facial challenges to legislation are generally disfavored," *FW/PBS, Inc., d/b/a Paris Adult Bookstore II v. City of Dallas*, 493 U.S. 215, 224, 110 S.Ct. 596, 604, 107 L.Ed.2d 603 (1990):

> Both exceptions, however, are narrow ones: the first kind of facial challenge will not succeed unless the court finds that "every application of the statute create[s] an impermissible risk of suppression of ideas," and the second kind of facial challenge will not succeed unless the statute is "substantially" overbroad, which requires the court to find "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court."

*New York State Club Ass'n*, 487 U.S. at 11, 108 S.Ct. at 2233 (quoting *Taxpayers for Vincent*, 466 U.S. at 798 n. 15 & 801, 104 S.Ct. at 2125 n. 15 & 2126); *see also City of Houston v. Hill*, 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987) (holding that "[o]nly a statute that is substantially overbroad may be invalidated on its face"); *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917, 37 L.Ed.2d 830 (1973) (same). Either type of challenge must be made based *on the face of the challenged statute or regulation*. *See Rust v. Sullivan*, —— U.S. ——, ——, 111 S.Ct. 1759, 1765, 114 L.Ed.2d 233 (1991); *New York State Club Ass'n*, 487 U.S. at 14, 108 S.Ct. at 2234 (same).

Based on their allegations in this case, appellants have attempted to make out the first type of facial challenge by showing that the text of the OGE/EPA regulation discriminates on the basis of viewpoint. However, it is obvious to us that no such discrimination appears on the face of the regulation. We find 40 C.F.R. § 3.503 (1991) quite instructive as it elucidates the otherwise elusive distinction between "official" and "unofficial" speech:

> Writing, speaking, or editing is normally *official* if it results from a request to EPA to furnish a speaker, author or editor. If an invitation is addressed to an employee, the invitation is *official* if it is tendered because of the employee's EPA position rather than the employee's individual knowledge or accomplishments.... Otherwise, such activities are *outside* [presumably "unofficial"] activities.

*Id.* Section 3.503, in our view, means that, facially speaking, the EPA will not consider viewpoint in classifying speech as "official" or "unofficial." [7] Though the official/unofficial distinction might be *applied* in the discriminatory manner appellants suggest, they must pursue that claim in the first instance, if at all, before the District Court, which correctly found that such a claim will turn on factual issues. *See Fantasy Book Shop, Inc. v. City of Boston*, 652 F.2d 1115, 1122 (1st Cir.1981).

There is, of course, a sense in which the OGE/EPA regulation may be said to be content-based. The regulation applies only to speech or writing that "focuses specifically on his official duties or on the responsibilities, policies and programs" of the EPA. 5 C.F.R. § 2636.202(b). We agree

---

456—are more appropriately dealt with in an as-applied challenge. *See infra* at 446–47.

**7.** Far from being caught "between a rock and a hard place," Dissent at 459 n. 12, we believe we are on solid ground in holding that the OGE/EPA regulation does not discriminate facially on the basis of viewpoint. In any event, "it is difficult to see how any government employer could regulate speech without, more or less directly, carving out an exception for speech approved by the employer. Employees will sometimes have to act as spokespeople." *Moore v. City of Kilgore*, 877 F.2d 364, 393 (5th Cir.1989). Consistent with this realization, all the OGE/

EPA regulation does is allow travel-expense reimbursement for the EPA's spokespeople, but not for employees—be they EPA supporters or critics—who do not speak for the EPA. The dissent's argument that the OGE/EPA regulation allows "the government's side [of the debate over EPA policies] ... open access to particular audiences and forms of expression but [denies such access to] employees who seek to speak from other perspectives," Dissent at 460, fails to recognize this last point—that unofficial speakers may be supporters or critics of the EPA—and the related point that official speech is not necessarily aimed at touting the policies of the EPA.

that the regulation is "content-based," in *some* sense, because it is "justified with[ ] reference to the content of the regulated speech," *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976), but not in any *meaningful* sense.

Instead, we view the regulation as one that does not "fit neatly into either the 'content-based' or the 'content-neutral' category." *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986). One such category of restrictions of speech—and the one into which we think the OGE/EPA regulation falls—encompasses restrictions that are based on the content of speech but seek to regulate only the "secondary effects" of the speech. *See R.A.V. v. St. Paul,* —— U.S. ——, ——, 112 S.Ct. 2538, 2546, 120 L.Ed.2d 305 (1992); *Renton,* 475 U.S. at 47–48, 106 S.Ct. at 928–29; *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion). Such a regulation is deemed content-*neutral* because it "serves purposes unrelated to the content of the expression." [8] *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1988); *see also Renton,* 475 U.S. at 48, 106 S.Ct. at 929. Importantly, this remains so "even if [the restriction] has an incidental effect on some speakers or messages but not others." *Rock Against Racism,* 491 U.S. at 791, 109 S.Ct. at 2754.

■ We find the Supreme Court's decisions in *Young, Renton* and *Rock Against Racism* controlling and agree with appellees that the OGE/EPA regulation serves a purpose unrelated to the suppression of free speech—namely, avoiding the appearance of impropriety. In *Pickering* terms,

avoiding the appearance of impropriety serves the further end of protecting the integrity and efficiency of the EPA's work force. Furthermore, we agree with appellees that this governmental interest is a "compelling" one. *See Keeffe v. Library of Congress,* 777 F.2d 1573, 1580–81 (D.C.Cir.1985) (holding that "prevent[ing] erosion of ... public confidence in the integrity of the [public] [s]ervice" is a "compelling" governmental interest). While it may be true that the regulation might have a negative impact on EPA critics, we find that impact to be "incidental," given that the interest the regulation serves is wholly unrelated to the suppression of free speech. *Rock Against Racism,* 491 U.S. at 791, 109 S.Ct. at 2754. The District Court was thus correct in holding that the OGE/EPA regulation is not content-based and that the relevant governmental interest is avoiding the appearance of impropriety, *not* the suppression of unofficial speech.[9]

■ Appellants' second argument for their facial challenge is that the OGE/EPA regulation is overbroad. Like appellants' first argument, this fits more neatly into the rubric of the first exception to the rule disfavoring facial challenges rather than the second. The First Amendment overbreadth doctrine is generally applied to challenges brought by plaintiffs who fall within the constitutionally permissible ambit of a restriction on speech, on behalf of third parties not before the court, as to whom the prohibition is unconstitutional. *See, e.g., Moore v. City of Kilgore,* 877 F.2d 364, 390–92 (5th Cir.1989). A court thus may not apply overbreadth analysis to a claim "that [a] statute is overbroad precisely because it applies to him—the plaintiff who is before us." *Id.; see also New York State Club Ass'n v. New York City,* 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101

8. We do not here attempt a blanket definition of content-neutrality. Rather, we merely note the Supreme Court's reasoning in treating *secondary-effects restrictions* as content-neutral. Aside from secondary-effects restrictions, we have stated that "lack of government disagreement with the message is a necessary condition for content neutrality, [but] it is not in all cases a sufficient one." *Christian Knights of the Ku*

*Klux Klan Invisible Empire, Inc. v. District of Columbia,* 972 F.2d 365, 373 (D.C.Cir.1992) (citing cases).

9. In reaching this conclusion, we have considered and rejected appellants' contention that the OGE/EPA regulation is fatally underinclusive. We defer discussion of that issue, however, until Part IV of this opinion. *See infra* at 448–51.

L.Ed.2d 1 (1988) (holding that "the second kind of facial challenge will not succeed unless the statute is 'substantially' overbroad, which requires the court to find 'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections *of parties not before the Court*'" (quoting *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984)) (emphasis added)). That is exactly the nature of appellants' "overbreadth" claim. *See, e.g.*, Appellants' Br. at 35 (arguing that "the OGE rule blanketly, with no exception, prohibits [appellants Sanjour and Kaufman] from obtaining *any* reimbursements for this speech" sponsored by appellant NC WARN).[10]

■ However, as the Supreme Court has recognized, the term "[o]verbreadth has also been used to describe a challenge to a statute that in all its applications directly restricts protected First Amendment activity and does not employ means narrowly tailored." *Secretary of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 967 n. 13, 104 S.Ct. 2839, 2852 n. 13, 81 L.Ed.2d 786 (1984). For that type of facial challenge to succeed, the plaintiff must carry the heavy burden of showing that the challenged statute or regulation is not narrowly tailored and that "there is no core of

easily identifiable and constitutionally proscribable conduct that the statute prohibits."[11] *Id.* at 965, 104 S.Ct. at 2851–52. Failing either showing, an overbreadth argument under the first type of facial challenge necessarily fails. *See Parker v. Levy*, 417 U.S. 733, 760, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974) (holding that courts must be "reluctant[ ] to strike down a statute on its face where there [are] a substantial number of situations to which it might validly be applied"); *see also Ferber*, 458 U.S. at 770 n. 25, 102 S.Ct. at 3362 n. 25 (same); *Letter Carriers*, 413 U.S. at 580–81, 93 S.Ct. at 2898 (same); *Moore v. City of Kilgore*, 877 F.2d 364, 391 (5th Cir.1989) (holding that courts should not facially invalidate overbroad statutes that "ha[ve] significant and lawful core application"). When the challenged statute does have a core of easily identifiable and constitutionally proscribable conduct, "the Court has required a litigant to demonstrate that the statute 'as applied' to him is unconstitutional." *Munson*, 467 U.S. at 965, 104 S.Ct. at 2851 (citing *Ferber*, 458 U.S. at 774, 102 S.Ct. at 3363). Because, as previously stated, we construe appellants' overbreadth argument to be a claim that the OGE/EPA regulation is not narrowly tailored for any purpose, we consider appellants' argument on the merits under the first exception to the rule against facial challenges.

**10.** In other words, although a party who believes a statute unconstitutionally restricts his own conduct can argue that the statute is overbroad as applied to third parties, we do not read appellants' brief as raising that type of facial challenge. Even if they had, we rather doubt that the OGE/EPA regulation is substantially overbroad. *See infra* at 446. As we read the somewhat confusing overinclusiveness section of appellants' brief, they really claim that the nexus between the asserted government interest and the regulation is so inexact that the regulation is substantially overbroad in all its applications—the first type of facial challenge.

**11.** We recognize that the *Munson* Court applied the latter formulation in the context of the assertion of third-party rights under the second type of facial challenge, but we fail to discern any analytical reason for restricting that burden to the third-party context. As *Munson* explained, the judicial reluctance to invalidate a statute on its face "is appropriate in cases where, despite some possibly impermissible ap-

plication, the remainder of the statute ... covers a whole range of easily identifiable and constitutionally proscribable ... conduct." 467 U.S. at 964–65, 104 S.Ct. at 2851 (ellipses in original; internal quotation marks omitted). That analysis is applicable regardless of whose rights are being asserted, as the *Munson* Court's citation, in support of the proposition quoted above, of two cases not involving the assertion of third-party rights indicates. *See* 467 U.S. at 965, 104 S.Ct. at 2851 (citing *New York v. Ferber*, 458 U.S. 747, 770 n. 25, 102 S.Ct. 3348, 3362 n. 25, 73 L.Ed.2d 1113 (1982) (challenge by owner of adult bookstore which rented pornographic films involving children to constitutionality of state statute criminalizing selling or otherwise promoting child pornography); *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, AFL–CIO*, 413 U.S. 548, 580–81, 93 S.Ct. 2880, 2898, 37 L.Ed.2d 796 (1973) (challenge by federal employees and federal employees union, *inter alia*, to constitutionality of federal statute restricting political activities of federal employees)).

Appellants correctly assert that any restriction on speech must be "narrowly drawn." *McGehee v. Casey*, 718 F.2d 1137, 1142–43 (D.C.Cir.1983) (quoting *Brown v. Glines*, 444 U.S. 348, 355, 100 S.Ct. 594, 600, 62 L.Ed.2d 540 (1980)); *see also Williams v. IRS*, 919 F.2d 745, 747 (D.C.Cir.1990) (per curiam). At least when a statute or regulation is content neutral, "the requirement of narrow tailoring is satisfied so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation" and "the means chosen are not substantially broader than necessary." *Ward v. Rock Against Racism*, 491 U.S. 781, 799–800, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989) (internal quotation marks omitted). Appellants claim that the instant regulation violates this standard because no appearance of impropriety arises from being reimbursed for out-of-pocket expenses, and they dismiss appellees' argument to the contrary as nothing more than "unadorned speculation." We disagree with both their basic assertion and their dismissal of appellee's argument.

Appellants' claim that expense reimbursement necessarily cannot give rise to an appearance of impropriety is simply incorrect. We think it plain that expense reimbursement may create not just an *appearance* of impropriety, but *actual* impropriety. For example, suppose a non-federal organization invited an EPA employee to give an unofficial speech in Hollywood (as Sanjour did in 1989). Suppose further that the organization was willing to pay, via expense reimbursement, for the employee to fly first-class, stay at an exclusive resort, and dine at five-star restaurants.[12]

Despite the extravagance of this employee's travel itinerary, appellants would have us believe that simply because at the end of the trip the employee is not enriched in monetary terms no appearance of impropriety has resulted. We disagree. It is plain to us that the employee *is* better off—he has received a valuable benefit based on the fact of his EPA employment—and that at least an appearance of impropriety may reasonably be said to result therefrom. Only by sheer formalism, ignoring both practical and economic effect, can it be argued that the employee has not received a valuable benefit. Consequently, even though a valuable benefit is conferred as "reimbursement" rather than as an outright gift, an appearance of impropriety can result from the acceptance of the benefit.

Once that rather obvious premise is established, it follows that the OGE/EPA regulation is not substantially overbroad and is "narrowly tailored" under *Ward v. Rock Against Racism*, 491 U.S. 781, 799–800, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989). As we have said, the regulation merely proscribes the receipt of expense reimbursement by unofficial speakers. Official speakers, by contrast, are allowed to receive expense reimbursement because, when employees speak in an official capacity (that is, present the views of the EPA), they are presumably under the watchful eye of the EPA. The same cannot be said as to unofficial speakers. When a benefit is paid in the open, subject to oversight by the responsible government officials, the public is reassured as to the legitimacy of the employee's receipt of the benefit. Even though the EPA does not *totally* control and oversee employees' acceptance of official travel reimbursement, it necessarily exercises *more* supervision over the activities of official speakers than it does over the similar activities of unofficial speakers. To give just one example, the employee decides for himself whether to accept an unofficial speaking invitation, but the EPA decides whether to provide an official speaker, even when an employee has received an official speaking invitation directly from a nonfederal source. *See* EPA ETHICS ADVISORY 91–10, at 2 (Aug. 30, 1991). Because the EPA necessarily exer-

---

12. Despite our use of the above hypothetical, we do not contend that a single hypothetical, standing alone, in which the regulation can constitutionally be applied, proves the OGE/EPA is narrowly tailored. The hypothetical is offered simply to refute appellants' argument that expense reimbursement can never give rise to an appearance of impropriety, a contention even the dissent does not endorse.

cises less control and oversight over unofficial speakers, the likelihood that an appearance of impropriety would arise by accepting unofficial expense reimbursement is correspondingly increased.

Moreover, the OGE/EPA regulation is narrowly tailored because it does not "burden substantially more speech than is necessary" to further the government's interest in avoiding the appearance of impropriety that, as just shown, may reasonably be said to result from accepting unofficial expense reimbursement. *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989). The appearance-of-impropriety reasoning applies with full force as long as the benefit the employee receives has *some* positive value. Even if we were to assume *arguendo* that the Government's asserted interest diminishes in substantiality and ultimately approaches zero weight in the *Pickering* balance as the benefit to which the regulation is applied decreases in value, we cannot agree with the dissent that it "throttles *much* valuable speech." Dissent at 461 (emphasis added).

■ As the size of the benefit approaches the inconsequential, the burden the OGE/EPA regulation imposes on First Amendment rights is correspondingly reduced. Potential unofficial speakers will be increasingly *less* "chilled" from giving unofficial speeches for inability to recover reimbursement for benefits of little value, such as "train fare and a few bites of casserole." Dissent at 456. Because of this phenomenon, any reduction in the weight of the Government's side of the *Pickering* balance is matched by a similar reduction on the employees' side, which means that the regulation may constitutionally be applied to trivial benefits and, as the dissent appears to concede, to benefits of considerable value as well. *See* Dissent at 457 (accepting reimbursement for benefits of considerable value "raise[s] an inference that the employee is travelling in luxury—receiving compensation in the form of fine dining and lush resort accommodations").

Altogether, the OGE/EPA regulation may constitutionally be applied to a wide variety of unofficial activities. The scope of its valid application exceeds the comparatively few cases where it might be unconstitutional to apply the regulation. In view of the foregoing, once it is established that public employee acceptance of benefits from entities outside the Government may reasonably be said to give rise to an appearance of impropriety, *see supra* pp. 445–46, and that the OGE/EPA regulation applies only where the employee has received a benefit, *see* 56 Fed.Reg. 1,721, 1,726 (1991) (to be codified at 5 C.F.R. § 2636.203(g) (1992)), the conclusion is inescapable that the OGE/EPA regulation is narrowly tailored on its face under *Rock Against Racism*. We therefore reject appellants' facial challenge asserting that the regulation can never be applied in a valid manner and hold that the OGE/EPA regulation is not substantially overbroad and is narrowly tailored. In sum, appellants' facial challenge, while asserting a species of "overbreadth," is unavailing under the first exception for the reasons set forth above and does not fit within the second exception.

The dissent's concerns that the OGE/EPA regulation would forbid an employee to accept inconsequential benefits, such as "train fare and a few bites of casserole," Dissent at 456, are not properly addressed in a facial challenge. Those concerns depend on fact situations not before us (recall that in this case appellants were to receive all-expense-paid trips from Washington, D.C. to North Carolina). *See American Library Ass'n v. Barr*, 956 F.2d 1178, 1189 (D.C.Cir.1992) (holding that courts may not address issues unrelated to the particular facts of a facial challenge because "[t]he judicial power does not extend to issuing 'an opinion advising what the law would be upon a hypothetical state of facts'") (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937)). Our insistence that only related factual circumstances be addressed in a facial challenge is grounded on more than a hypertechnical interpretation of Article III, for "[b]y focusing on the factual situation

before us, and similar cases necessary for development of a constitutional rule, we face 'flesh-and-blood' legal problems with data 'relevant and adequate to an informed judgment.'" *New York v. Ferber,* 458 U.S. 747, 768, 102 S.Ct. 3348, 3360, 73 L.Ed.2d 1113 (1982) (footnotes and citations omitted). In addition, "[w]hatever hypotheticals plaintiffs [and the dissent] may devise are countered by other, equally plausible possibilities that negate their point." *American Library Ass'n,* 956 F.2d at 1189. Therefore, "whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which [the regulation's] sanctions, assertedly, may not be applied," *Broadrick v. Oklahoma,* 413 U.S. 601, 615–16, 93 S.Ct. 2908, 2917–18, 37 L.Ed.2d 830 (1973), and appellants remain free on remand to adduce proof on precisely the type of issues the dissent raises.

Appellants' "unadorned speculation" argument reflects, we think, a misunderstanding of the quantum of proof required of the Government in *Pickering* cases. Neither we nor the Supreme Court have held that in a *Pickering* case, the Government must prove that a regulation on speech overlaps with the threatened harm to the governmental interest at stake with mathematical precision. Indeed, to place such a burden of proof on the government, which might well be insurmountable in cases where, as here, harm to the government interest is unquantifiable, would be flatly inconsistent with the settled notion that "the State has interests as an employer in regulating the speech of its employees that differ substantially from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). It would also be inconsistent with our prior recognition that "[v]alues are no less significant for being subtle, intangible and nonquantifiable." *Henderson v. Lujan,* 964 F.2d 1179, 1184 (D.C.Cir.1992).

To the contrary, we and the Supreme Court have accepted the government's claim of harm to the relevant governmental interest if it is "reasonably believed." *See Connick v. Myers,* 461 U.S. 138, 154, 103 S.Ct. 1684, 1694, 75 L.Ed.2d 708 (1983); *Hubbard v. EPA,* 949 F.2d 453, 460 (D.C.Cir.), *vacated in part on other grounds,* 982 F.2d 531 (D.C.Cir.1992) (en banc). That appellees' allegations of harm are reasonably believed is supported by the Highest Authority. As counsel for appellees stated in oral argument: "The biblical injunction is that you can't serve two masters." More precisely, "[n]o man can serve two masters: for either he will hate the one, and love the other; or else he will hold to the one, and despise the other." *St. Matthew* 6:24 (King James version).

The specter of EPA employees accepting valuable benefits from outside sources for unofficial activities raises the distinct possibility that they will appear to be (or actually will be) serving two masters, namely the public interest and their own pecuniary interest, to the detriment of the former. That scenario, it seems to us, must be reasonably believed; indeed, it may well, *in itself,* "make unequivocal its harmful effects." *American Postal Workers Union, AFL–CIO v. United States Postal Serv.,* 830 F.2d 294, 304 n. 13 (D.C.Cir.1987). As we have held, "it is inescapable that some off-duty activities of a public servant are incompatible with the undivided loyalty and integrity that [such] a person must show." *Keeffe v. Library of Congress,* 777 F.2d 1573, 1580 (D.C.Cir.1985). On either theory, then, appellees have made an adequate showing of harm to the identified governmental interest, which we have found to be compelling.

### 3.

### *The Balance of the Competing Interests*

■ We finally come to the balance of the competing interests. The OGE/EPA regulation does impose a burden on the First Amendment rights of EPA employees by preventing them from accepting reimbursement from non-federal sources for travel expenses incurred in giving unofficial speeches. However, that burden is but a moderate one because EPA employees are allowed to speak on any subject matter they choose. At the same time, the regulation serves the compelling governmental

end of promoting the integrity and efficiency of the EPA's work force by avoiding the appearance of impropriety that may reasonably be said to result from the employees' acceptance of travel-expense reimbursements (or other forms of compensation) from non-federal sources. In light of this, we hold that the *Pickering* balance tilts decidedly in appellees' favor.

## IV.

In addition to their overinclusiveness challenge, appellants urge the underinclusiveness of the OGE/EPA regulation as an independent basis for striking it down. They claim that if accepting non-federal expense reimbursement for unofficial speech creates an appearance of impropriety, so does accepting such reimbursement for official speech. Because the regulation prohibits only the former and not the latter, appellants claim, the regulation is underinclusive and therefore is not "narrowly tailored."

Neither argument is well taken. First, to make out their underinclusiveness claim, appellants must do more than show that the OGE/EPA regulation applies only to unofficial but not official speakers. They must show that the OGE and the EPA could not "reasonably conclude" that accepting reimbursement for official speech "presents sufficiently less likelihood of the harms sought to be prevented to justify [its] differential treatment." *Fantasy Book Shop, Inc. v. City of Boston*, 652 F.2d 1115, 1121 n. 6 (1st Cir.1981). Appellants have failed to meet that burden in this case. When an EPA employee speaks in an official capacity, he is presumably under the watchful eye of the EPA because it has sent him to present its views, much like a mouthpiece for the agency. *See* 40 C.F.R. § 3.503 (1991). Unofficial EPA speakers, however, are not sent by the EPA, which raises the prospect that by accepting travel reimbursement, they are attempting to trade on their public office for personal gain. *See supra* at 445–46. The OGE and the EPA, therefore, *could*

reasonably conclude that accepting reimbursement for unofficial activities may create a greater appearance of impropriety than accepting reimbursement for official activities.

Second, even if the OGE/EPA regulation is underinclusive for the reason appellants suggest, that fact standing alone does not render the regulation unconstitutional. As we read the relevant cases, we may not invalidate a statute or regulation on First Amendment grounds just because it is underinclusive. Rather, we may do so *only* if the underinclusiveness clearly gives rise to an inference that the real motivation behind the statute or regulation is the suppression of speech. *See, e.g., Florida Star v. B.J.F.*, 491 U.S. 524, 540, 109 S.Ct. 2603, 2612, 105 L.Ed.2d 443 (1989) (holding that "facial underinclusiveness ... raises serious concerns about whether [the State] is, in fact, serving, with this statute, the significant interests which appellee invokes"); *FCC v. League of Women Voters of California*, 468 U.S. 364, 396, 104 S.Ct. 3106, 3126, 82 L.Ed.2d 278 (1984) (striking down statute banning noncommercial educational broadcasting stations from "editorializing" because its underinclusiveness "undermines the likelihood of a genuine governmental interest in preventing private groups from propagating their owns views via public broadcasting") (brackets and internal quotation marks omitted); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214–15, 95 S.Ct. 2268, 2275, 45 L.Ed.2d 125 (1975) (invalidating as "strikingly underinclusive" ordinance forbidding the showing of nudity in drive-in theaters because the City's justification was patently pretextual); *News America Pub., Inc. v. FCC*, 844 F.2d 800, 815 (D.C.Cir.1988) (striking down statutory amendment precluding the FCC from renewing plaintiff's waiver of the ban on simultaneously owning a newspaper and television station in the same city because "the only 'evil' that the Amendment scotched was the possibility that [Rupert] Murdoch [(plaintiff's owner)] might get extensions").[13]

---

13. Although the dissent asserts that underinclusiveness is germane to the weight on the govern-

ment's end of the *Pickering* scale, *see* Dissent at 457, none of these cases were *Pickering* cases.

Where the underinclusiveness does not clearly imply a censorial motive, we must reject the underinclusiveness claim as long as the statute or regulation actually furthers the proffered speech-neutral governmental interest. *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 799–800, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989) (holding that "the requirement of narrow tailoring is satisfied so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation" and "the means chosen are not substantially broader than necessary") (internal quotation marks omitted); *Posadas de Puerto Rico Assocs. v. Tourism Co.*, 478 U.S. 328, 342–43, 106 S.Ct. 2968, 2977, 92 L.Ed.2d 266 (1986) (upholding statute banning advertisement of casino gambling but not other types of gambling because "whether or not other kinds of gambling are advertised, the restrictions on the advertising of casino gambling 'directly advance' the legislature's interest"); *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52–53, 106 S.Ct. 925, 931–32, 89 L.Ed.2d 29 (1986) (upholding ordinance preventing the operation of adult movie theaters within 1,000 feet of homes, churches and schools because its underinclusiveness "in no way suggests that the city has 'singled out' adult theaters for discriminatory treatment").

With these principles in mind, we find persuasive the recent decision of the Sixth Circuit in *Ater v. Armstrong*, 961 F.2d 1224 (6th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 493, 121 L.Ed.2d 431 (1992). In *Ater*, a Kentucky statute, justified as ensuring the safe and orderly flow of traffic, prohibited people from standing in the roads and on the medians between roads. However, the same statute excepted standing in either place for the purpose of soliciting funds, as long as a police or other public safety vehicle was present to aid the flow of traffic.[14] The police informed Ater, a Grand Dragon of the Realm of the Kentucky Invisible Empire, Knights of the Ku Klux Klan ("KKK"), that the statute barred him from distributing KKK literature on or along the roads. Ater filed suit, claiming, *inter alia*, that the statute was underinclusive for its asserted purpose in that it allowed roadside solicitation but not leafleting.

The Sixth Circuit rejected Ater's underinclusiveness claim, citing *Ward v. Rock Against Racism*, 491 U.S. 781, 800, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989), for the proposition that the statute was narrowly tailored, even though it was underinclusive. In spite of the statute's underin-

---

As cases involving restrictions on the speech of the citizenry, the Supreme Court performed no balancing test and could not have meant to establish to what degree, if any, underinclusiveness entitles the proffered governmental interest to less weight vis-a-vis the First Amendment rights of public employees. *Pickering* cases are different, both in kind and in degree, from cases involving restrictions on the speech of people outside the Government's employ. *See, e.g., Connick v. Myers*, 461 U.S. 138, 154, 103 S.Ct. 1684, 1694, 75 L.Ed.2d 708 (1983) (holding that "the Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs") (internal quotation marks omitted); *Cafeteria & Restaurant Workers Union, Local 473, AFL–CIO v. McElroy*, 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961) (sharply distinguishing between the "governmental function[s]" of exercising the power "to regulate or license, as lawmaker" and "as proprietor, to manage the [government's] internal operation[s]"). We note again that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968).

Even if the underinclusiveness cases discussed above are applicable in *Pickering* cases, it is clear to us that the Court did *not* consider underinclusiveness in determining whether the proffered state interest was "compelling," as the dissent argues. Instead, the Court merely considered the claimed underinclusiveness to decide whether or not the government was in fact serving the proffered interest with the challenged statute or regulation.

**14.** The dissent's attempt to distinguish *Ater* on the basis that "the regulation distinguished only between *types* of speech—soliciting funds was allowed on roadways, but other forms of speech were not," Dissent at 460 n. 13, thus is unavailing. The OGE/EPA regulation, like the statute in *Ater*, distinguishes between types of speech—namely, "official" and "unofficial" speech, a categorization which is, on its face, both content- and viewpoint-neutral. *See supra* at 442–43.

clusiveness, the court of appeals upheld the statute as "intended to promote the legitimate goal of safety in the roadways." *Ater*, 961 F.2d at 1229. It explained:

> By prohibiting the distribution of literature in the roadways, the statute eliminates no *more* activity than was considered necessary.... Although this statute presents an underinclusive remedy, it clearly serves the state's interest in avoiding traffic congestion and fostering road safety. It cannot be doubted that Kentucky has the power to limit pedestrian activities upon its roadways. We cannot believe, as the dissent apparently would have us hold, that Kentucky prohibited nearly all forms of pedestrian activity upon its roads, excepting only solicitation, because it wished to censor expression. Its reason clearly was safety.

*Id.* at 1229–30. The court also rejected the proposition that the court should "require a legitimate government interest that justifies the exception of solicitation from the general proscription of pedestrian activity on the roads," holding that

> The legitimate government interest need only justify the general prohibition of protected activity; so long as its distinctions are content neutral, it need not justify the allowance of some expression.... Unless a prohibition is content based, we examine the legislature's motive for prohibiting the forms of conduct it chooses to prohibit, not its motive for excepting other forms of conduct from the prohibition.

*Id.* at 1230 n. 5 (emphasis added); *see also Walsh v. Brady*, 927 F.2d 1229, 1238 (D.C.Cir.1991) (Williams, J., concurring) (stating that "it surely cannot be the case that as a general matter the Constitution militates in favor of keeping content-neutral exemptions from free speech bans as narrow as possible").

As applied to the case before us, *Ater* means that the OGE/EPA regulation's possible underinclusiveness is irrelevant if (1) it is content-neutral and (2) its ban on reimbursement for travel expenses incurred during unofficial activities furthers the proffered interest in avoiding the appearance of impropriety. *See Ater*, 961 F.2d at 1229–30 & n. 5. As our prior discussion makes clear, the regulation satisfies both conditions. First, the regulation is content-neutral. It merely regulates the secondary effects of accepting unofficial travel-expense reimbursement. *See R.A.V. v. St. Paul*, — U.S. ——, ——, 112 S.Ct. 2538, 2546, 120 L.Ed.2d 305 (1992); *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1988); *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion).

Second, we are confident that the OGE/EPA regulation, despite its claimed underinclusiveness, serves the asserted interest in avoiding the appearance of impropriety resulting from accepting valuable benefits from non-federal sources for unofficial activities. Accepting such compensation is the root cause of such an appearance, regardless of whether the same is true of official expense reimbursement. We add only that "[w]e simply have no basis on this record for assuming that" the EPA will not amend the OGE/EPA regulation to apply to official expense reimbursement as well if it later proves to be the source of a similar appearance of impropriety. *Renton*, 475 U.S. at 52, 106 S.Ct. at 931. Therefore, under the principles we announce today, in harmony with *Ater v. Armstrong*, 961 F.2d 1224 (6th Cir.1992), and the Supreme Court cases discussed above, appellants' claim that the OGE/EPA regulation is underinclusive, even if true, is insufficient reason to sustain their facial challenge.[15]

---

**15.** We have applied these cases here even though they were not *Pickering* cases, but we emphasize that constitutional scrutiny of restrictions on the speech of public employees is *significantly less demanding* than the scrutiny applied to restrictions on the speech of citizens.

For example, outside of the public employment context, content-based restrictions on speech are subject to the strictest of judicial scrutiny, *Simon & Schuster v. Members of the New York State Crime Victims Bd.*, — U.S. ——, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991), and are "presump-

To summarize, the regulation is narrowly tailored to serve a compelling governmental interest—avoiding the appearance of impropriety that may reasonably be said to result from acceptance of non-federal expense reimbursement for unofficial speech or writing. That government interest, which is unrelated to the suppression of speech, outweighs EPA employees' moderate First Amendment interest in receiving compensation for unofficial speech. Accordingly, under *Pickering,* we hold that the OGE/EPA regulation does not facially violate the First Amendment.

## CONCLUSION

Lest our mandate be misunderstood, we again emphasize the narrowness of our holding today. We do not uphold the OGE/EPA regulation against all First Amendment attack. Rather, we merely hold that the regulation is not unconstitutional on its face, based on the claims put to us. As much as appellants have tried to convince us otherwise, the OGE/EPA regulation is neither facially content-based nor viewpoint-based. Although it is possible that the EPA might selectively apply the regulation in order to suppress the unofficial speech of its critics, appellants remain free, should they have any proof of this, to pursue that claim in the District Court.

*Affirmed and remanded.*

WALD, Circuit Judge, dissenting:

I agree with my colleagues that maintaining public confidence in the integrity of government is an interest of paramount importance. "[A] democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of ... corruption." *United States v. Mississippi Valley Generating Co.,* 364

U.S. 520, 562, 81 S.Ct. 294, 315, 5 L.Ed.2d 268 (1961). Actions by public employees that suggest they are using their public offices for personal gain risk shaking public confidence, and that fact may in appropriate instances provide a justification for curtailing the right of employees to speak about job-related topics. But it is also settled constitutional doctrine that to justify infringing on the First Amendment rights of federal employees, the government must do more than nod its head in the direction of a significant interest it claims to protect. It must demonstrate that the specific regulation it proposes does not choke off more employees' speech than is necessary to advance the government's legitimate interest and that the regulation does not risk suppressing speech solely because of disagreement with the employees' ideas. In my view, the Environmental Protection Agency's ("EPA" or "agency") interpretation, in its Ethics Advisory, of the Office of Government Ethics ("OGE") regulation (the "OGE/EPA regulation") does not pass that constitutional test.

The OGE's regulation bars federal employees from "receiving compensation, including travel expenses, for speaking or writing on subject matter that focuses specifically on [their] official duties or on the responsibilities, policies, and programs of [their] employing agency." 56 Fed.Reg. 1724–25 (1991) (to be codified at 5 C.F.R. § 2636.202(b)). "Travel expenses" are defined in the regulation to include the "actual and necessary cost of transportation, lodging and meals incurred while away from the employee's residence or principal place of employment in connection with [a] ... speech or article." 56 Fed.Reg. 1726 (1991) (to be codified at 5 U.S.C. § 2636.-203(g)). The EPA, in its Ethics Advisory, construed this prohibition to apply only to

---

tively invalid." *R.A.V. v. St. Paul,* — U.S. —, —, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992). However, as we made clear above, restrictions on the speech of public employees are subject only to the deferential *Pickering* balancing test. *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20

L.Ed.2d 811 (1968). Further examples could be provided, but the point is clear—because restrictions on public employees' speech are inherently less suspect than restrictions on the speech of the citizenry, *id.* at 568, 88 S.Ct. at 1734, courts must apply less rigorous First Amendment scrutiny to the former than to the latter.

"non-official" travel expenses. EPA ETHICS ADVISORY 91-1, at 3 (April 2, 1991).

My colleagues acknowledge that any appearance of impropriety arising from an employee receiving reimbursement for legitimate expenses involved in giving a speech on agency-related matters must be linked to an impression that the employee is receiving a valuable benefit from a private party. *See* Majority Opinion ("Maj. Op.") at 445. While an employee who receives lodging and meals at a deluxe vacation resort in return for giving a speech on matters related to her job might reasonably be thought to have improperly benefited from her public position, much reimbursement does not partake of "fun in the sun"; rather, it simply insures that the speaker will not be financially worse off because of her speechmaking. For example, a private group may simply repay the employee for the costs of gas and tolls incurred in traveling to the site of the speech. Because the OGE/EPA regulation is deaf to such distinctions, it is far too blunt an instrument for diminishing federal employees' First Amendment rights in order to achieve the end of preserving public confidence in government.

Conversely, in many instances where expense reimbursements should raise eyebrows, the regulation is bafflingly oblivious. So long as EPA employees speak "officially," they may continue to receive extravagant vacations to exotic locales on private parties' tabs. Why the continued acceptance of such largesse does not raise the same problems that the government is apparently seeking to remedy through the total ban on privately reimbursed expenses for unofficial speech is inexplicable to me. The absence of any parallel provision concerning privately supported "official" speakers raises grave questions as to whether the government's "significant" interest in avoiding the appearance of impropriety is served by this regulation at all, and at best impugns the force of the government's interest in it. Additionally, the patently differential treatment accorded "officially" approved speakers and "unofficial" ones suggests that the regulation may indeed have the purpose or effect of sup-

pressing speech based solely on the agency's disagreement with particular ideas. Under the OGE/EPA rule, the government's "mouthpieces" (the majority's term, *see* Maj. Op. at 448)—those who speak "officially"—are eligible to receive reimbursements from private sources. But people who speak only "unofficially," who may have different views on current agency policies, are systematically dissuaded from speaking by the denial of any reimbursements even for barebones out-of-pocket expenses like bus fare or an overnight at the YMCA.

In sum, a total ban on privately reimbursed expenses for unofficial speeches on *agency-related topics* accompanied by a bland acceptance of privately reimbursed expenses for "approved" speeches that toe the current agency line is not a constitutionally tailored response to the problem of the appearance of impropriety arising from federal employees taking private benefits for work-related speeches. Such a regulation burdens the First Amendment rights *of federal employees* without bestowing comparable benefits on the public at large.

## I. DISCUSSION

### A. *Legal Standard*

*Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the time-honored yardstick for measuring restrictions on government employees' speech, is the governing standard here. Under that familiar rubric, we weigh EPA employees' interest in speaking on matters of public concern against the EPA's interest, as an employer, "in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734.

### B. *Employees' Interests*

The majority significantly understates the burden that the OGE/EPA regulation places on public employees' speech. Because the OGE/EPA regulation does not overtly gag anyone, they conclude that the burden is only "moderate." *See* Maj. Op. at 441. I fear such a conclusion partakes

of the "sheer formalism," *id.* at 445, my colleagues elsewhere decry. Realistically, under this regulation, government employees—people of generally modest incomes—will not have the means to make speeches involving more than *de minimis* travel expenses; out-of-town speeches will be as surely eliminated as if the EPA prohibited them outright.[1] *See* Brief of Amici Curiae Environmental and Civic Organizations in Support of Appellants 4 (noting that the regulation would effectively prevent environmental groups from obtaining live speakers from the EPA); *see also Simon & Schuster, Inc. v. Members of the New York State Crime Victims Bd.,* —— U.S. ——, ——, 112 S.Ct. 501, 511, 116 L.Ed.2d 476 (1991) (noting that application of statute preventing compensation—not mere reimbursement—for speech on certain subjects would have aborted many classic works, even though it is "hyperbole" to assume that law would have "prevent[ed] publication of *all*" such works because some would have been written without compensation (emphasis in original)); *cf. Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 585, 103 S.Ct. 1365, 1372, 75 L.Ed.2d 295 (1983) (noting that the threat of burdensome taxes "can operate as effectively as a censor to check critical comment").

The regulation, moreover, effectively squelches speech of the highest value in the First Amendment hierarchy. Under *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), employee speech is protected only when it deals with matters of "public concern," *i.e.,* when it contributes to debate on issues of community interest.[2] *See id.* at 145, 103 S.Ct. at 1689 (noting *Pickering*'s roots in a mode of First Amendment analysis that reserves the "highest rung" for public issue speech). The OGE/EPA regulation restricts dissemination of information regarding current EPA policies, a matter on which EPA employees obviously have unique insights to share with the general populace, and, it must be noted, the regulation does so not any basis that these unofficial speeches are likely to be inaccurate, misleading, or expose confidential information. Depriving the general populace of a valuable and often unique perspective on important issues affecting their welfare requires a serious and carefully thought out justification. *Cf.* Cass R. Sunstein, *Government Control of Information,* 74 CAL.L.REV. 889, 916 (1986) (noting that the "systemic consequences of government purchases of first amendment rights" must be considered even when there is a legitimate government interest in restriction of speech); *Developments in the Law—Public Employment,* 97 HARV.L.REV. 1611, 1768 (1984) (*"Pickering* recognized that public employees, by virtue of their expertise and experience, are often among the citizens who are best informed about the workings of government and that their opinions are thus especially valuable to the public."); Kathleen M. Sullivan, *The First Amendment Wars,* THE NEW REPUBLIC, September 28, 1992, at 35, 39 ("[T]hose dependent on government funding may, for the reasons that created their dependency, have some distinctive contribution to make to the speech mix."). A democratic nation's interest in maintaining an informed citizenry, as well as an individual government employee's interest in free expression, must be respected

---

1. My colleagues claim, *see* Maj. Op. at 441 n. 5, that their conclusion as to the weight of the employee's interest accords with the Supreme Court's admonition in *Rust v. Sullivan,* —— U.S. ——, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), that " '[t]here is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity.' " *Id.* at ——, 111 S.Ct. at 1772 (quoting *Maher v. Roe,* 432 U.S. 464, 475, 97 S.Ct. 2376, 2383, 53 L.Ed.2d 484 (1977)). That statement, however, points in the other direction. The *Rust* Court was emphasizing that the government's use of its own funds to promote certain activities (childbirth) and not others (abortion) does not raise the same concerns that exist when the state directly regulates protected private activity. In this case, the government is doing the latter—engaging in "direct state interference with a protected activity"—by regulating the availability of *private* funding for protected speech.

2. My colleagues acknowledge that the speech at issue here easily clears the public concern hurdle. *See* Maj. Op. at 440.

in striking an appropriate balance here. *Cf. Minneapolis Star,* 460 U.S. at 585, 103 S.Ct. at 1372 ("[A]n informed public is the essence of working democracy."). The government cannot be allowed to limit speech of public import where its legitimate interest in guarding the integrity of its operations. is not directly implicated.

## C. *The Government's Interest*

The government asserts only one interest here to justify its ban on expense reimbursement: preventing the appearance of impropriety stemming from private subsidization of a public employee's speechmaking on agency-related matters. Because the precise nature of the feared "impropriety" is somewhat nebulous, it is useful to examine exactly how the receipt of expense money from private parties might shake the public's confidence in the integrity of its government and those who serve in it. Two possible scenarios come to mind: an appearance that the private party is currying favor from the federal employee and an appearance that the federal employee is using "public office for private gain." EPA Brief at 24.

The first scenario plays out like this. When a private party pays for a special service by a government employee (or gives the employee a gift), people will immediately speculate about whether the private party expects an illicit favor in return. Such arrangements (especially ones between regulators and the regulated or the beneficiaries of regulation) raise obvious questions about the integrity and impartiality of government decisionmakers; put simply, the public may suspect that the employees are being "bought and paid for." But this species of impropriety necessarily involves (1) a payor who cares about the future actions of the agency and (2) the receipt of a benefit from that payor by an agency employee. The subject matter of the speech or other service the employee

provides to the private payor is not crucial; the private party doesn't really care about the service that it is superficially paying for. Instead, it hopes to receive some future favor in exchange for its largesse. The nature of the service paid for is relevant only to the extent an outsider will think the employee's service is worth the price; when the service appears overpriced, the inference that the private payor is actually buying something else is stronger.

The second species of impropriety also involves the presence of a benefit, but, in contrast to the first, it *does* require that the subject matter of the federal employee's speech (or other service) relate to her job. When a public employee gets additional benefits from work that the government is already paying for, she may be thought to be improperly using "public office for private gain"—or, in the majority's terms, serving two masters. The receipt of money from private donors for information related to the federal employee's work, even when there is no reason to suspect that the donor is trying to curry favor, may cause the public to lose faith in the single-minded dedication of government employees to the public interest. *Cf.* ROBERT G. VAUGHN, CONFLICT-OF-INTEREST REGULATION IN THE FEDERAL EXECUTIVE BRANCH 37 (1979) ("[P]ractices that enrich government employees beyond their appropriate compensation solely because of their status as government employees undermine public faith and confidence."); ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK, CONFLICT OF INTEREST AND THE FEDERAL SERVICE 211 (1960) (when private parties pay federal employees to do their jobs it creates "a generally unwholesome appearance that breeds suspicion and bitterness among fellow employees" and outsiders).[3] Although both scenarios may be implicated by the OGE/EPA regulation, its exclusive focus on employee speech related to current EPA duties or policy suggests strongly that it is primarily motivated by the latter one.

---

**3.** Of course, not all private gain from federal employment raises concerns. Generally, we do not begrudge former federal employees the opportunity to profit from experience gained in

public service, as long as their post-employment behavior itself does not directly contradict ethical norms. *See* Beth Nolan, *Public Interest, Private Income,* 87 Nw.UNIV.L.REV. 57, 80 (1992).

## D. Overinclusiveness

Assuming that to be the case,[4] I conclude that the total ban on reimbursement is an overinclusive restriction on EPA employees' First Amendment rights. In a prior *Pickering* case, we required that a rule be "narrowly drawn" to "restrict speech no more than is necessary" to serve the government's limited goal. *See McGehee v. Casey*, 718 F.2d 1137, 1143 (D.C.Cir.1983) (internal citation omitted). A similar tailoring requirement should apply here because of the exceptionally strong First Amendment interests on the other end of the balance. *Compare id.* (requiring "narrow tailoring" where government sought to classify and prohibit speech on matters of public concern) *with Williams v. IRS*, 919 F.2d 745, 747 (D.C.Cir.1990) (per curiam) (requiring only that regulations be "tai-

lored" where court could not find any firm First Amendment interest on the other side and merely assumed the existence of one *arguendo); see also* EPA Brief at 22–23 (arguing that the government's burden should vary with strength of employees' speech interests).[5]

The overinclusiveness in this regulation results from the breadth of its definition of a "benefit," the *sine qua non* of an appearance of impropriety in this context. *See* Maj. Op. at 445. The rule does not outlaw only travel reimbursements that may be perceived to be compensation; instead, it prohibits the receipt of *all* "travel expenses," which include the "actual and necessary cost of transportation, lodging and meals." 56 Fed.Reg. 1726 (1991) (to be codified at 5 C.F.R. § 2636.203(g)). Thus, the regulation curtails reimbursement in a wide range of cases in which the public

---

**4.** This assumption in no way prejudices the government's case. The regulation is significantly less tailored to address the problems caused by the first scenario. In any case, both scenarios require a benefit, and the absence of a benefit is the key to the overinclusive nature of the rule.

**5.** My colleagues assert that traditional overbreadth doctrine allows challenges to a rule's fit only by plaintiffs who admittedly fall within the constitutionally permissible reach of a regulation on behalf of third parties not before the court. *See* Maj. Op. at 443–44. At the same time, however, they acknowledge that the Supreme Court has recognized that

... "overbreadth" is not used only to describe the doctrine that allows a litigant whose own conduct is unprotected to assert the rights of third parties to challenge a statute, even though "as applied" to him the statute would be constitutional [citation omitted]. "Overbreadth" has also been used to describe a challenge to a statute that in all its applications directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest. *Schaumburg [v. Citizens for a Better Environment,* 444 U.S. 620,] 637–39 [100 S.Ct. 826, 836–37, 63 L.Ed.2d 73] (1980); *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 786 [98 S.Ct. 1407, 1421, 55 L.Ed.2d 707] (1978); *Zwickler v. Koota,* 389 U.S. 241, 250 [88 S.Ct. 391, 396, 19 L.Ed.2d 444] (1967). *Cf. City Council of Los Angeles v. Taxpayers for Vincent,* [466 U.S. 789, 797, 104 S.Ct. 2118, 2124, 80 L.Ed.2d 772 (1984)] (recognizing the validity of a facial challenge but suggesting that it should not be called "overbreadth")....

.... Whether that challenge should be called "overbreadth" or simply a facial challenge, the

point is that there is no reason to limit challenges to case-by-case "as applied" challenges when the statute on its face and therefore in all its applications falls short of constitutional demands.

*Secretary of State v. Joseph H. Munson Co.,* 467 U.S. 947, 965 n. 13, 104 S.Ct. 2839, 2852 n. 13, 81 L.Ed.2d 786 (1984). Yet, my colleagues go on to cite a different passage from *Munson* for the proposition that to prevail on such a claim, a first- or third-party "plaintiff must carry the heavy burden of showing that ... 'there is no core of easily identifiable and constitutionally proscribable conduct that the statute prohibits.'" Maj. Op. at 444 (quoting *Munson,* 467 U.S. at 965, 104 S.Ct. at 2852). Just last Term, however, the Supreme Court, after determining that a statute was not narrowly tailored, unanimously invalidated it without engaging in any such inquiry. *See Simon & Schuster,* —— U.S. at ——–——, 112 S.Ct. at 511–12 ("The State's interest in compensating victims from the fruits of crime is a compelling one, but the Son of Sam law is not narrowly tailored to advance that objective. As a result, the statute is inconsistent with the First Amendment."). Also, despite my colleagues' suggestion that appellants do not argue that the statute is overinclusive as applied to third parties, *see* Maj. Op. at 444 n. 10, it is evident to me that they have made just that claim. *See* Appellants' Brief at 34 ("[T]he OGE/EPA regulation is unquestionably 'overinclusive.' For example, employees could be fired for merely accepting a beverage at a speaking event where the employee talked about EPA policy. There is no question that such behavior does not present an 'appearance of impropriety.' However, the regulation does not distinguish between minor [and] major reimbursements.").

would not believe that a benefit has been conferred. A box lunch and bus fare to Buffalo as well as a lobster and Lear jet to Lake Tahoe are equally *verboten* under this rule. Indeed, the box lunch alone would run afoul of the regulation.[6] Yet it is almost incomprehensible that an ordinary citizen would look askance at a federal employee addressing a church supper in return for train fare and a few bites of casserole.[7]

But, I would emphasize, what is involved here is far more than a judicial quibble over the fine tuning of a rule. Contrary to my colleagues' assertion that there are "comparatively few cases" where the regulation might be unconstitutionally applied, *see* Maj. Op. at 446, the wide gulf between the means—restricting all reimbursement whether or not the public could conceivably believe that a benefit has been received— and the end—avoiding the appearance of impropriety caused by the receipt of a benefit—imposes a wide-reaching and deleterious effect on federal employees' free speech, as well as on potential listeners' opportunity to become informed about public affairs. Many small nonprofit environmental organizations that reimburse expenses for "unofficial" speeches by EPA employees argue as *amici* against the regulation. The accommodations most such groups can provide are exceedingly modest, generally only enough to insure that the speaker will not *lose* money for his efforts. In such cases, no benefit has been bestowed and thus the reimbursement does

not raise concerns about impropriety, but the regulation still curtails the dissemination of valuable information. A more tailored regulation [8] could put a reasonable cap on reimbursement (akin to the federal employee's per diem allowance) thereby assuring that the employee is not dissuaded from speaking because of financial loss but also avoiding any side benefits from his doing so. In truth, the OGE/EPA regulation is something of a blunderbuss, and the government's use of it is flatly inconsistent with the more precise targeting required by the First Amendment for regulating valuable speech interests. *See, e.g., Simon & Schuster,* —— U.S. at ——–——, 112 S.Ct. at 511–12 (finding statute "not narrowly tailored" because it swept in a wide range of expression that did not serve the government's interest in preventing criminals from profiting while victims go uncompensated); *Carey v. Brown,* 447 U.S. 455, 465, 100 S.Ct. 2286, 2292, 65 L.Ed.2d 263 (1980) (statute proscribing all nonlabor picketing of residences was overinclusive because "the statute makes no attempt to distinguish among various sorts of nonlabor picketing on the basis of the harms they would inflict" on the state's asserted interest in residential privacy).

The majority, of course, reaches a different conclusion. They base their approval of the regulation on the theory that the "appearance-of-impropriety reasoning applies with full force as long as the benefit the employee receives has *some* positive

---

**6.** Further, the regulation would apply even if the employee *loses* income because he has taken uncompensated leave to give the speech.

**7.** Contrary to my colleagues' assertion, *see* Maj. Op. at 441 n. 6, 446–47, the use of examples such as these (which are not very far afield from the facts of this case, *i.e.,* NC WARN's offer to pay appellants' actual travel expenses from Washington, D.C. to North Carolina) to dramatize the utter lack of fit between a rule and the government's interest is familiar in facial challenge cases. For example, in *Simon & Schuster,* the Court argued that because the law would apply to the autobiography of a prominent figure that included a brief reference to stealing a worthless item as a youthful prank—certainly a fact situation not before the Court, *see id.* at 447—it was "to say the least, not narrowly tailored to

achieve the State's objective." —— U.S. at ——, 112 S.Ct. at 512.

**8.** For example, the Ethics Reform Act defines honoraria to exclude "actual and *necessary* travel expenses." 5 U.S.C. app. § 505(3) (emphasis added). Similarly, in the EPA's own evaluations of whether reimbursement for "official" speechmaking is allowable, it differentiates between allowable expenses and "premium" accommodations, for which an employee must provide additional explanation. Interestingly, however, the EPA does not put a firm cap on the amount of allowable reimbursement for "official" travel. First-class airfare and accommodations are acceptable as long as similar arrangements are available to other individuals attending a meeting or function. *See* EPA ETHICS ADVISORY 91–10, at 3 (August 30, 1991).

value." Maj. Op. at 446 (emphasis in original); *see also id.* at 446 (citing the regulatory provision that defines "travel expenses" to include all actual and necessary costs of travel in support of the proposition that the regulation applies "only where the employee has received a benefit"). Thus, the majority apparently assumes that the public will view private reimbursement as suspect not only when the speaker receives the type of pleasure and benefit associated with premium transportation and accommodations—a situation exemplified by the majority's hypothetical employee who "fly[s] first-class, stay[s] at an exclusive resort and dine[s] at five-star restaurants," Maj. Op. at 445—but also when a private party merely offsets some or all of the speaker's actual and reasonable expenses, no matter how small the reimbursement or how pedestrian the accommodations. Because, as indicated above, *see supra* page 440, I cannot believe that the public will be suspicious—will lose faith in the integrity of its government—when a federal employee is only receiving reimbursement for reasonable expenses such as gas and tolls, I part company with my colleagues on this basic point.

Nor can I concur in their alternative argument that as the reimbursement decreases in value, the disincentive to speak and the government's interest in preventing the appearance of impropriety decrease in lockstep. To a federal employee taking home several hundred dollars a week, train fare and similar expenses that the majority characterizes as "trivial," *see* Maj. Op. at 446, are significant expenditures; thus, a requirement that the employee pay such expenses out-of-pocket creates a significant disincentive to out-of-town speaking. At the same time, however, reimbursement for such modest expenses does not raise an inference that the employee is traveling in luxury—receiving compensation in the form of fine dining and lush resort accommodations—and thus cannot reasonably be thought to raise appearance of impropriety problems. Because in the large number of cases that fit in this middle ground between *de minimis* and premium reimbursements there is a substantial disincentive to speak but no countervailing government interest, I conclude that the regulation is not narrowly tailored.

I could stop there. An abysmal lack of fit between the perceived problem and the solution causes the reimbursement ban to flunk the constitutional test for facial validity set out in *McGehee*. However, I believe that the regulation has other significant defects as well.

### E.  *Underinclusiveness*

The majority believes that the underinclusiveness of this regulation is, at most, of limited relevance in striking the *Pickering* balance in this case. *See* Maj. Op. at 443 n. 9. I cannot agree. The underinclusiveness of this speech-restricting rule is relevant in two ways. My first, although not my primary, point is that when a statute or regulation does not in fact cover a substantial part of the activity giving rise to the harm the government claims as its target, that fact "raises serious doubts about whether [the government] is, in fact, serving ... the significant interests which [it] invokes." *Florida Star v. B.J.F.*, 491 U.S. 524, 540, 109 S.Ct. 2603, 2612, 105 L.Ed.2d 443 (1989); *id.* at 541, 109 S.Ct. at 2613 ("Without more careful and inclusive precautions against alternative forms of dissemination, we cannot conclude that Florida's selective ban on publication by the mass media satisfactorily accomplishes its stated purpose."); *see also id.* at 541–42, 109 S.Ct. at 2613 (Scalia, J., concurring) ("[A] law cannot be regarded as protecting an interest 'of the highest order' ... when it leaves appreciable damage to that supposedly vital interest unprohibited." (internal citation omitted)); *FCC v. League of Women Voters*, 468 U.S. 364, 396, 104 S.Ct. 3106, 3126, 82 L.Ed.2d 278 (1984) (assuming that government's asserted interest in the law is legitimate, its "substantiality" is "dubious" because of underinclusiveness and overinclusiveness). Although my colleagues insist that the Supreme Court has announced this principle only in cases outside the *Pickering* context, I see no logical reason why it should not apply to *Pickering* cases as well. While the government's interest

need not be as strong under *Pickering* as under the strict scrutiny standard applied in other First Amendment cases, under both tests we must evaluate the substantiality—the weight—of the proffered government concern: under strict scrutiny, we ask whether the government's rule is serving a compelling state interest; under *Pickering*, we inquire whether the government's interest is stronger than the private interest asserted in a particular case. And the Supreme Court has told us that the underinclusiveness of a regulation is definitely germane to the generic type of assessment involved in either inquiry. *See, e.g., id.*

Because the OGE/EPA regulation leaves so much undone, I conclude that the government's interest in the regulation is not as strong as my colleagues assert and thus that the weight on the government's end of the scale is lighter than they contend.[9] An EPA employee may still receive significant benefits from private parties—"fly first-class, stay at an exclusive resort and dine at five-star restaurants," Maj. Op. at 445—for giving "official" speeches relating to her duties or EPA policy. Indeed, the record in this case demonstrates that such privately funded benefits have flowed freely at the EPA. To cite a few examples, EPA employees have gone "officially" to Santa Barbara on Chevron, U.S.A.'s tab, to Scottsdale, Arizona on the Water Utilities Executive Council's account, and to Ft. Lauderdale on the American Coal Ash Association's account. Why those reimbursements do not raise the same appearance of impropriety problems as the receipt of ex-

penses from "unofficial" speeches totally escapes me (and I would assume others as well).[10] In both cases, a benefit—if indeed it is assumed that every reimbursement is a benefit—is received from a private party for receipt of information related to the employees' work. In fact, it would seem logical that officially sanctioned benefits from private sources would create a greater appearance of *systemic* governmental impropriety than the unsanctioned indiscretions of individual bureaucrats and, of the two, would produce the more deleterious effect on public confidence in the workings of our government.

The only defense that the majority gives for the critical relevance of the official/unofficial distinction is the *assumption* that, when speaking officially, an agency employee is "under the watchful eye of the EPA." Maj. Op. at 448. Even if this totally unsupported empirical assertion were correct, it is unclear why it is even relevant. If it is the receipt of expense reimbursement from a private source that creates an appearance of impropriety, no amount of official scrutiny can dissolve that problem. Whether or not the agency is "watching" the employee, she still gets the so-called "benefits" of the enjoyable trip, those benefits still have a nexus to her federal employment, and they are still being paid by a private party (and possibly even a private party with a conflict of interest with the EPA, *see* EPA ETHICS ADVISORY 91–10, at 3 (August 30, 1991) (allowing reimbursement from a "conflicting source" under certain circumstances)). In fact, it was the perception of impropriety from the receipt of *authorized* benefits such as honoraria from

---

9. Of course, the weight on the government's end of the scale is particularly important here because the regulation affects such significant speech interests and because so much of that effect falls on speech that does so not implicate the government's interests.

10. The official/unofficial distinction may be relevant to some other government interests *not asserted here.* For example, the government may have a legitimate interest in employee loyalty that justifies preventing certain policymaking employees from criticizing the official position on certain matters. *See Hall v. Ford,* 856 F.2d 255, 265 (D.C.Cir.1988); *see also Rankin v.*

*McPherson,* 483 U.S. 378, 390–91, 107 S.Ct. 2891, 2900, 97 L.Ed.2d 315 (1987) (noting that interest in punishing government employee speech based on content must be examined in relation to the employee's authority and public accountability). But this regulation covers virtually all EPA employees, not just those who hold key policy positions. Also, the government might have an interest in keeping certain proprietary or sensitive information confidential, and so wish to prevent employees from disseminating important information without prior approval. That concern has also not been raised here.

private parties that led to the passage of the Ethics Reform Act.

Perhaps agency supervision would be relevant if employees had no control over their official travel because the agency fielded all requests for speakers and parcelled out the assignments. But that is not the case here. While an EPA employee may not solicit invitations, the *employee* may receive them personally and decide if she wants to seek official approval to accept them. *See id.* at 2. Given, then, that the employee herself makes the initial determination whether a particular trip confers a benefit worth pursuing, it is hard to see why official "oversight" is likely to make the public less suspicious of such private sponsorship. But even if such oversight were somehow relevant because it brought the transaction "out in the open," it would be constitutional overkill to *ban* all unofficial reimbursement on that basis when a sensible requirement of public documentation represents a far more tailored response to the perceived problem.

In the end, I can find no basis for concluding that the official/unofficial distinction has any relevance to the government's interest in preventing the appearance of impropriety. *Cf. Simon & Schuster,* ─── U.S. at ───, 112 S.Ct. at 510 (rejecting a proffered government interest in regulating a subset of speech because the state could not "explain why [it] should have any greater interest in compensating victims from the proceeds of ... 'storytelling' than from any of the criminal's other assets").

That brings me to my second, and primary, concern, which is perhaps better de-

scribed as about viewpoint discrimination, rather than underinclusiveness per se.[11] *See R.A.V. v. City of St. Paul,* ─── U.S. ───, ───, 112 S.Ct. 2538, 2545, 120 L.Ed.2d 305 (1992). The Supreme Court has repeatedly noted that when a statute is "underinclusive" in a way that turns on content (even more so for viewpoint), the risk of idea suppression is almost always present. *See, e.g., id.; see also Erznoznik v. City of Jacksonville,* 422 U.S. 205, 215, 95 S.Ct. 2268, 2275, 45 L.Ed.2d 125 (1975) (presumption of validity of underinclusive legislation "has less force when a classification turns on the subject matter of expression," and statute could not be upheld absent a justification for differentiating between activities which would appear to cause similar harms); *cf. City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 762–63, 108 S.Ct. 2138, 2146–47, 100 L.Ed.2d 771 (1988) (noting that the greater includes the lesser syllogism "is blind to the radically different constitutional harms inherent in the 'greater' and 'lesser' restrictions").

That concern is apt here. The OGE/EPA regulation does not merely draw an irrelevant, but benign, distinction. The majority acknowledges that the rule allows an EPA employee to receive reimbursement for travel expenses when the agency has "sent him to present *its views,*" and he is acting "much like a mouthpiece," Maj. Op. at 448 (emphasis added), but not when he is free to present his own perspective on issues of current EPA policy (which would comport with the official line only coincidentally).[12] Thus, an EPA employee's re-

---

**11.** The majority is at most only partially correct in stating that underinclusiveness is significant only if it "clearly gives rise to an inference that the real motivation behind the statute or regulation is the suppression of speech." Maj. Op. at 446. The first reason I identified for looking at underinclusiveness—to assess the weight of the government's interest in the particular regulation—has nothing to do with legislative intent. Additionally, the Supreme Court has often found underinclusiveness relevant without looking explicitly at motive. *See, e.g., Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 592, 103 S.Ct. 1365, 1375, 75 L.Ed.2d 295 (1983); *see also News America Publishing, Inc. v. FCC,* 844 F.2d 800,

805 (D.C.Cir.1988) ("Accepting th[e] intuition [that singling out some subcategory of speech may signal an intent to censor] without making an actual determination of legislators' motives, the Supreme Court has for the regulation of speech insisted on a closer fit between a law and its apparent purpose than for other legislation.").

**12.** The majority is between a rock and a hard place on this issue. In its attempt to distinguish the harms caused by "official" and "unofficial" speech reimbursements, it acknowledges that the regulation only allows speech by those who present the agency's views. *See* Maj. Op. at 448. But at other points the opinion is less forthright.

ceipt of the "benefit" of private reimbursement of travel expenses is conditioned upon her speech presenting the EPA's point of view, "touting its policies," *id.* at 442 n. 7. My colleagues assert, however, that the OGE/EPA rule's distinction is not "real" viewpoint discrimination because the government must always be able to exempt its own spokespeople from any speech regulation it imposes on other employees. *See id.* If the EPA merely used its own funds to pay its "mouthpieces" and did not interfere with speech by others in any way, my colleagues would be correct that viewpoint bias concerns were off base. *See Rust v. Sullivan,* — U.S. —, —, 111 S.Ct. 1759, 1772, 114 L.Ed.2d 233 (1991) (in selectively funding activities it believes to be in the public interest, the "Government has not discriminated on the basis of viewpoint"). But EPA has gone far beyond such an unexceptional arrangement. First, the disputed regulation relates only to privately funded speech; that fact by itself raises different concerns than a *Rust*-type case. *See FCC v. League of Women Voters,* 468 U.S. 364, 400, 104 S.Ct. 3106, 3128, 82 L.Ed.2d 278 (1984) (invalidating content-based restriction on speech that was funded from both public and private sources). More importantly, the rule controls only *some* privately funded speech; it curtails only speech that may not present the agency's views. It is clear that, under *Picker-*

*ing,* such regulations raise viewpoint bias concerns. *See Rankin v. McPherson,* 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987) ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech."). While we have approved differential treatment of speech critical of a public employer in specific instances, we have done so because of the significance of the government's countervailing interest, *not* because the regulation did not implicate concerns about viewpoint bias. *See supra* note 10 (noting that in some contexts the government may have a significant interest in preventing critical speech by policymaking employees but noting that that interest, even if asserted, would not justify a regulation applicable to all EPA employees).

Thus, the viewpoint-based distinction inherent in this regulation implicates core First Amendment concerns because it risks skewing debate; the government's side has open access to particular audiences and forms of expression but employees who seek to speak from other perspectives must overcome a financial disincentive.[13] *See, e.g., R.A. V. v. City of St. Paul,* — U.S. at — – —, 112 S.Ct. at 2547–48 (facially invalidating a law that in practice allowed

---

*See id.* at 441–42 (arguing that we can only determine effect of the official/unofficial distinction after empirical investigation). The majority refers to a regulation that defines the term "official" in reference to speaking offers "tendered because of the employee's EPA position," as opposed to the employee's "individual knowledge or accomplishments." *See id.* at 442. That gloss leads me to the same conclusion. When one is speaking because of one's position, one is presumably giving the views associated with that position.

If "official" does not imply this meaning, then I do not know what the agency does mean. In contrast to prior cases, *see, e.g., McGehee v. Casey,* 718 F.2d 1137, 1144–45 (D.C.Cir.1983), there are no precise standards to cabin the EPA's discretion and assure that some criteria whose application would be subject to review will be regularly applied. Absent such standards, the regulation allows the unfettered discretion that presents the "risk of suppression of

speech" justifying a facial challenge. *See City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 757–59, 108 S.Ct. 2138, 2144–45, 100 L.Ed.2d 771 (1988). Also, I cannot agree with my colleagues that this argument has not been urged on this court. The appellants discuss the EPA's "unfettered discretion" several times in their briefs. *See Appellants Brief at* 16, 35. While those discussions are not extensive, they do make my point: that the EPA has not directed our attention to any standards that will insure that its regulation will be applied neutrally.

**13.** This fact differentiates this case from *Ater v. Armstrong,* 961 F.2d 1224 (6th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 493, 121 L.Ed.2d 431 (1992), which the majority finds persuasive. There, the regulation distinguished only between *types* of speech—soliciting funds was allowed on roadways, but other forms of speech were not. There was no classification based on content or viewpoint, and thus less risk that underinclusiveness might reflect discrimination on the basis of disagreement with ideas.

" 'fighting words' that do not themselves invoke race, color, creed, religion, or gender ... in the placards of those arguing *in favor* of racial, color, etc. tolerance and equality" but not in the placards of those *who opposed* those ideas (emphasis in original); *id.* at ——, 112 S.Ct. at 2543 (even in the extreme case where an entire category of speech may be proscribed because of its negligible value, such regulation may not be "made the vehicle[ ] for content [much less viewpoint] discrimination unrelated to th[at type of speech's] distinctively proscribable content"). To escape invalidation, the government must, at the very least, demonstrate a significant interest in regulating this *subclass* of speech. *See Hall v. Ford,* 856 F.2d 255, 264 (D.C.Cir.1988) (finding restriction on public employee's critical speech justified by a significant interest because the relationship between the employee and the government fell " 'into that narrow band of fragile relationships requiring for job security loyalty at the expense of unfettered speech' " (quoting *Gonzalez v. Benevides,* 712 F.2d 142, 150 (5th Cir.1983)); *see also R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2546 (within presumptively proscribable class of speech "differential treatment [of] ... a content-defined subclass of proscribable speech" is valid if that "subclass happens to be associated with particular 'secondary effects' of the speech."). Because the only interest that my colleagues assert to justify the differential treatment of this subclass—the unique interest in avoiding the appearance of impropriety where the EPA's watchful eyes are not present—is, at best, insubstantial, I conclude that the EPA has not justified this blanket restriction of private reimbursement for "nonofficial" speeches by all EPA employees with a sufficiently weighty countervailing government concern. Thus, the EPA rule has created a process that impermissibly risks suppression of ideas based on their viewpoint. Even if the other defects in the law were insufficient to merit invalidation, that fact in my view would put the kibosh to the regulation.

## II. CONCLUSION

Government employee speech is protected by the First Amendment, and can be restricted only where and to the extent the government can show its legitimate interests require restriction. *See Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). This regulation throttles much valuable speech that does not implicate the EPA's interests in avoiding an appearance of impropriety from private reimbursement of the expenses incurred in giving a speech about the agency. At the same time, the reimbursement of "official" speechmaking by the same private parties, which might be expected to raise even greater concerns about impropriety, is left unchecked. Finally, as the majority astutely recognizes, the regulation allows private support of agency "mouthpieces" but not of individuals who might voice contrary opinions. Taking account of all these factors, the *Pickering* balance tips decisively against the government. I therefore dissent.